1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SIERRA CLUB; and CENTER FOR
ENVIRONMENTAL LAW AND POLICY,

                      Plaintiffs,
     and

THE SPOKANE TRIBE OF INDIANS,

                 Plaintiff-Intervenor,

    v.

DENNIS MCLERRAN; GINA MCCARTHY;
and UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

                  Defendants,

     and

SPOKANE COUNTY; KAISER ALUMINUM
OF WASHINGTON LLC; and STATE OF
WASHINGTON DEPARTMENT OF
ECOLOGY,

              Defendant-Intervenors.

Case No. 11-CV-1759-BJR

MEMORANDUM ORDER REMANDING
MATTER FOR FURTHER
CONSIDERATION

      This matter is before the Court on cross motions for summary judgment by Plaintiffs,

Plaintiff-Intervenor, Defendants, and Defendant Intervenors.  Plaintiffs Sierra Club and Center

for Environmental Law and Policy (hereinafter "Plaintiffs") claim that Defendant EPA failed to

perform a nondiscretionary duty under the Clean Water Act ("CWA").  Plaintiffs raise claims

1

under the citizen-suit provisions of the CWA, 33 U.S.C. § 1365(a)(2), and the Administrative

Procedures Act ("APA"), 5 U.S.C. § 706.  Plaintiff-Intervenor Spokane Tribe of Indians

("Spokane Tribe") incorporates Sierra Club's claims and asserts additional claims under the

CWA, APA, and federal trust responsibility.  Having reviewed the parties' briefs together with

all relevant materials, the Court grants partial summary judgment for Defendant EPA and

Defendant-Intervenors (collectively, "Defendants") and grants partial summary judgment for

Plaintiffs and the Spokane Tribe.  The Court's reasoning follows:

# I.  BACKGROUND

### A.  The CWA Statutory Framework

Congress passed the CWA to "restore and maintain the chemical, physical, and biological

integrity of the Nation's waters."  33 U.S.C. § 1251.  In order to achieve that objective, Congress

declared as a "national goal" that the "discharge of pollutants into the navigable waters be

eliminated by 1985."  33 U.S.C. § 101(a)(1).[1]

The CWA's regulatory program focuses on two potential sources of pollution: "point"

sources and "nonpoint" sources.  A "point" source is any "discernible, confined and discrete

conveyance" from which pollutants are or may be discharged.  *See id.* § 1362(14).  A "nonpoint"

source is any non-discrete source, such as runoff from stormwater or irrigation agriculture.  *Id.*

The CWA regulates point source pollution through the National Pollution Discharge Elimination

System ("NPDES") permit process.[2]  NPDES permits limit the discharge of pollutants through

quantitative limits on the amount of pollutants released from each point source.  *See id.* § 1342.

---

[1] Needless to say, this goal has proven optimistic.

[2] Most states, including Washington, are authorized to administer the NPDES permit program.

As part of its regulatory program, Section 303(d) of the CWA imposes duties on the states and the EPA. States are required, subject to federal oversight, to adopt water quality standards for each waterbody or waterbody segment within the state's boundaries. 33 U.S.C. § 1313. If a waterbody does not meet these standards or is not expected to meet them, the state must then designate that body as a "water quality limited segment." *Id.* § 1313(d)(1)(A); *see* 40 C.F.R. § 130.2. The list of "water quality limited segments" is known as the "303(d) list." After creating the 303(d) list, states must prioritize the water quality segments based on the severity of their pollution and their beneficial uses. *See* 33 U.S.C. § 1313(d)(1)(A). States are required to develop a "total maximum daily loads" (TMDL) for each pollutant impairing each water segment on the 303(d) list in accordance with these priorities. 40 CFR § 130.2 (f). A TMDL establishes the maximum amount of pollutants a water quality limited segment can receive daily without violating the state's water quality standards. TMDLs are supposed to be developed in accordance with their priority ranking on the 303(d) list. *See* 33 U.S.C. § 1313(d)(1)(C).

States must submit the ranked list of water quality limited segments and TMDLs to the EPA "from time to time." *Id.* § 1313(d)(2). The first such submission was due on June 26, 1979, just 180 days after the CWA was enacted. Once a submission is made, certain mandatory EPA duties are triggered. First, within 30 days of submission, the EPA must approve or disapprove of the water quality limited segments and the corresponding TMDLs. *Id.* If the EPA approves a submission, the submission is incorporated by the state into its continuing planning process and NPDES permitting. *Id.* at §303 (e) (3). If the EPA disapproves, the EPA must, within 30 days of the disapproval, make its own identification of appropriate water quality limited segments or establish its own TMDLs. *Id.* The CWA is silent as to the nature of the

3

EPA's obligations if a state fails to make any submissions or fails to make a particular submission.

**B.  History of Spokane River TMDL for PCBs**

In the State of Washington, the 303(d) list and TMDLs are prepared by Intervenor Washington State Department of Ecology (hereinafter "Ecology").  This case concerns the regulation of polychlorinated biphenyls (PCBs) in the Spokane River.[3]  It is undisputed that PCBs are industrial chemicals that are "persistent, bioaccumulative, and toxic."  AR 14A at 487.  The Spokane River has the worst PCB contamination in the state and has been subject to a Spokane County and Washington Department of Health fish consumption advisory since 1994 and 2003, respectively.  AR 15 at 97; AR Supp. 5, 7.  The 303(d) list Ecology submitted in 1996 identified five segments of the Spokane River that exceeded water quality standards for PCBs.  AR 2710.  The most current 303(d) lists, for 2008 and 2010, identify fifteen segments of the Spokane River that exceed water quality standards for PCBs.  AR 80.[4]  Ecology had also identified segments that exceed water quality standards for other pollutants in the Spokane River, and has developed TMDLs for other pollutants in the Spokane River and tributaries.  AR 222-23.  Of particular note was a recent group of nine TMDLs for dissolved oxygen in the Spokane River.  AR 503.  Ecology prepared this group of nine TMDLs over the course of 12 years; EPA approved them in 2010.  AR 224.

---

[3] For convenience, the Court uses "Spokane River" to refer to the Spokane River itself, the lake into which it flows (Spokane Lake, also known as Long Lake), and the Little Spokane River. The parties generally group these waterbodies together and this action appears to target regulation of all three.

[4] Upon Sierra Club's request, and with no opposition by Defendants, the Court takes judicial notice of the 2010 303(d) list, and the EPA approval of that list, which occurred in 2012. Neither documents are part of the administrative record in this case.  *Available at* http://www.ecy.wa.gov/programs/wq/303d/currentassessmt.html; http://yosemite.epa.gov/r10/water.nsf/tmdls/WA-303d-2010-approval.

No TMDLs for PCB have been submitted to EPA to date.  Ecology conducted a TMDL assessment for PCBs in the Spokane River during 2003 and 2004.  AR 1331.  In 2006, Ecology produced a document entitled "Spokane River PCBs Total Maximum Daily Load [:] Water Quality Improvement Plan."  AR 1319.  The document was labeled "Draft – 6-19-06 – Do not cite or quote."  *Id.*  In the document, Ecology cited the statutory requirement that "[w]aters placed on the 303(d) list require preparation of [TMDLs]."  AR 1333.  Recognizing that fifteen segments of the Spokane River were on the 303(d) list for PCB pollutants, Ecology explained that "[a] TMLD has been determined to be the action needed to address these listings."  *Id.*

There are several water quality criteria applicable to the Spokane River, including levels promulgated by the federal government, by Washington State, and by the Spokane Tribe.  AR 1348.  Ecology selected the most stringent water quality standard, the Spokane Tribe's, as the "the basis for calculating necessary load reductions and load allocations" for the draft.  AR 1402.  The parties agree that adopting the Spokane Tribe's water criterion would likely mean PCB load reductions of 95-99 percent.  AR 1409.  The draft document set load reductions for various dischargers on the Spokane River, with reductions of over 99 percent for some of the dischargers.  AR 1409.  In 2006, Ecology shared a draft TMDL with the EPA, the tribe, the state of Idaho, the dischargers, and interested members of the public.

The parties dispute whether this draft document contained sufficient information from which a final PCB TMDL could have been produced.  Emails from Ecology staff members indicate that Ecology originally contemplated finalizing the TMDL at some point in 2007, and by mid-2008 was projecting a completion date of June 2009.  AR 1062.  Throughout this period, Ecology continued to collect data.  Delays in the preparation of the dissolved oxygen TMDL caused some uncertainty as to when the PCB TMDL would be completed.  AR 1071.

Eventually, Ecology issued a finalized version of the 2006 draft document, but with several significant revisions.  The document title did not include any reference to Total Maximum Daily Load.  Instead the document, released in April 2011, was retitled "Spokane River PCB Source Assessment 2003-2007."  AR 63.  Some introductory material explaining TMDLs was also excised.  AR 63.  Though the document still identified the target water quality level for PCBs and explained the overall loading reductions that would be needed to comply with that standard, it did not include permissible wasteload amounts for individual Spokane River dischargers.

The following month, Ecology released a second document, the "Spokane River Toxics Reduction Strategy," which set forth the agency's "strategy or 'road map' for reducing and removing toxic contamination in water, water sediments and soil in the Spokane River watershed."  AR 485.  That document contained the following explanation of Ecology's change in course:

> A draft Spokane River PCB TMDL was issued for public comment in June 2006 but was not completed because of the need for more data, including more accurate stormwater data, updated fish tissue sampling results, and the addition of new Spokane Tribe water quality standards for PCBs based on updated fish consumption rates. The draft TMDL was revised with this updated information in 2009 and issued as the Spokane River Source Assessment Report in 2011.
>
> ***
>
> Ecology is not currently planning to develop a PCB TMDL with wasteload allocations, but this is still a potential tool for the future. Setting wasteload allocations through a TMDL would set a target well below the 'background' PCB concentrations observed in remote bodies of water with no obvious source of contamination other than aerial deposition.
>
> In part because it would establish an impossible near-term target, and based on its experience with the Spokane River Dissolved Oxygen TMDL, which took 12 years to complete, Ecology is opting to proceed directly to implementing measures to reduce all toxics to the Spokane River. Those measures are described in this strategy. Such a *straight-to-implementation* plan is a recent strategy being

6

1
2
3

> adopted by the EPA and Ecology to address the many bodies of water that are on
> the list of polluted waters [called the 303(d) list] through tools other than TMDLs.
> Ecology plans to develop a straight-to-implementation plan for Spokane River
> toxics in 2012.

4
5

AR. 503 (emphasis in original).  After 2010, Ecology renewed the permits of several

6

Spokane River dischargers, and issued a new permit to Spokane County.  None of these

7

permits reflected the load reductions anticipated by the draft TMDL.  However, Ecology

8
9

did condition permits on permittee monitoring and permittee participation in a "Regional

Toxics Task Force."

10

Sierra Club brought this action in October 2011.  On May 25, 2012, Ecology

11

submitted a letter to the EPA, stating:

12
13
14
15

> If Ecology determines that the Task Force is failing to make measurable progress
> toward meeting applicable water quality criteria for PCBs, Ecology would be
> obligated to proceed with development of a TMDL in the Spokane River for
> PCBs or determine an alternative to ensure water quality standards are met.
> Ecology remains committed to proceeding with a TMDL should it be necessary.

16

AR 1 at 2.  In December 2012, Sierra Club submitted documents to the EPA for inclusion

17

in the administrative record, and requested a determination from the EPA regarding

18

whether Ecology had, through its conduct, made a "constructive submission" of the PCB

19

TMDL, i.e. abandoned the TMDL, thereby triggering the EPA's duty to prepare a

20

TMDL.  AR B and C.  The EPA responded on April 12, 2012, finding no constructive

21
22

submission.  AR A.  The EPA determined that "Ecology's decision to delay completion

23

of a PCB TMDL for the Spokane River is within the discretion of the State of

24

Washington," and that "Ecology has not renounced completion of a PCB TMDL for the

25

Spokane River if one is required."  *Id.*  In reaching this decision, the EPA noted that

26

Ecology had submitted 1372 TMDLs since 1999.  *Id.*  The EPA cited the gaps in

information concerning PCBs, the lengthy delays associated with preparing a TMDL, and the scarcity of resources supporting Ecology's decision to defer the TMDL.  *Id.*  The EPA also observed that interim measures to achieve water quality standards are an acceptable alternative to a TMDL.  *Id.*  The EPA pledged to monitor the situation, along with Ecology's progress in issuing other TMDLs, and indicated that it "may reconsider this decision if significant relevant circumstances change."  *Id.*  Sierra Club then amended its complaint to include two APA claims challenging the April 2013 letter, in addition to its preexisting CWA citizen-suit claim.

## II.     DISCUSSION

### A.  CWA – Claim Based Upon Section 505(a)(2)

§505(a)(2) of the CWA authorizes citizens to institute actions in federal court against the EPA for failure to perform any act or duty under the CWA that is not discretionary with the EPA.  33 U.S.C. § 1365(a)(2).  Plaintiffs contend that the EPA is subject to §505(a) liability because it breached a mandatory duty under § 303(d) of the CWA.  According to Plaintiffs, the EPA's non-discretionary duty to either approve or disapprove a TMDL was triggered when Ecology "clearly and unambiguously" indicated that it will not be preparing a TMDL for PCBs in the Spokane River.

### 1.   EPA Has a Non-Discretionary Duty to Act When a State Clearly and Unambiguously Abandons a Particular TMDL

Defendants argue that, as a matter of law, the EPA does not have a statutory duty to approve or disapprove a state's failure to submit a particular TMDL.  In determining the scope of the EPA's mandatory duty under Section 303(d), the court is guided by the fundamental principles of statutory construction.  "Proper statutory construction requires

8

more than linguistic examination and review of the rules of statutory construction.  The interpretation should be reasonable, and where the result of one interpretation is unreasonable, while the result of another interpretation logical, the latter should prevail." *Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977).  A court must construe a statute's language so as to give effect to the intent of Congress.  *Id.*

The mandatory TMDL process requires that states identify water segments that are below the state's relevant water quality limits; establish a priority ranking for those waters; and establish TMDLs in accordance with the priority ranking.  The relevant text of the CWA is as follows:

> (2) Each state shall submit to the Administrator from time to time, with the first such submission not later than 180 days after the date of publication of the first identification of pollutants under §1314(a)(2)(D) of this title, for his approval, the waters identified and the loads established. . . . The Administrator shall either approve or disapprove of such identification and load not later than 30 days after the date of submission.  If the Administrator approves such identification and load, such State shall incorporate them into its current plan . . . If the Administrator disapproves such identification and load, he shall not later than 30 days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and . . . shall incorporate them into its current plan . . .

The statute clearly contemplates (somewhat naively as time has shown) that states will promptly submit TMDLs for their listed waterways and that the EPA's duty to prepare a TMDL would be triggered when it disapproved of a state's submitted TMDL. The problem with the statute has not arisen in the context of disapproved submitted TMDLs but in a state's failure to submit TMDLs.  Notably, the CWA is silent as to the EPA's responsibilities when a state abdicates its responsibility to submit TMDLs.  *See Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422, 1425 (W.D. Wash. 1991).  The

Seventh Circuit was the first Circuit to address the nature of the EPA's obligations in light of this silence.  In *Scott v. City of Hammond, Indiana*, the Seventh Circuit held that, even in the absence of express language in the statute, the EPA has a duty to develop TMDLs for a particular waterbody when a state fails to comply with the CWA's submission requirements.  741 F.2d 992 (7th Cir. 1984).  The *Scott* case involved a citizen suit against the EPA for failure to prescribe TMDLs for pollutants discharged into Lake Michigan after Illinois and Indiana failed to submit any draft TMDLs for Lake Michigan over the course of several years.  *Id.*  Finding it "unlikely that an important aspect of the federal scheme of water pollution could be frustrated by the refusal of states to act," the court rejected the EPA's argument that Congress did not intend to establish a statutory duty for the EPA in the case of state inaction.  *Id.*  Instead, the *Scott* court held "if a state fails over a long period of time to submit proposed TMDLs, this prolonged failure may amount to the constructive submission by that state of no TMDLs," thereby triggering the EPA's mandatory duty.  *Id.*  Since Indiana and Illinois had produced no TMDLs for the Lake Michigan waterbody, the court remanded the matter to the district court with instructions "to proceed as if the states had submitted proposals of no TMDLs unless [there is] evidence indicating that the states are, or will soon be, in the process of submitting TMDL proposals or some factor beyond the scope of the complaint has made TMDL submission impracticable."  *Id*. at 997, n. 11.

In 2002, the Ninth Circuit expressly adopted the constructive submission doctrine in *San Francisco BayKeeper v. Whitman*.  297 F.3d 877, 883 (9th Cir. 2002).  *BayKeeper* concerned a citizen suit alleging that California's failure to submit any TMDLs for any water bodies in California constituted a "constructive submission" of no TMDLs for the

10

entire state, thereby triggering the EPA's non-discretionary duty to prepare TMDLs for the entire state. *Id.* Citing *Scott*, the Ninth Circuit held that state inaction can amount to a constructive submission if a state "clearly and unambiguously" indicates that it will not submit any TMDLs. *Id.* However, in applying this standard, the court held that California had not clearly and unambiguously abandoned its TMDL program for the state. *Id.* This holding was premised on a finding that, since 1994, California submitted "at least eighteen TMDLs and . . . established a schedule for completing its remaining TMDLs." *See id.* at 883-84.[5]

Defendants assert that a constructive submission occurs only when a state produces few or no TMDLs for the whole state over a substantial period of time: If a state has a robust TMDL program, its decision to abandon a particular TMDL does not trigger the EPA's non-discretionary duty. Doc. No. 91 at 27. The Court questions this narrow interpretation of the doctrine for the reasons set forth below.

In making this argument, Defendants rely on *BayKeeper's* holding and language, which focused on the state-wide TMDL program. This reliance is misplaced. The issue in *BayKeeper* was whether California's failure to produce a significant number of TMDLs constituted a *programmatic* failure for the *entire* state. *Id.* at 880-82. Clearly, California's producing several TMDLs and committing to more demonstrates that California had not abandoned its TMDL program. *See id.* However, the question here is whether Washington has abandoned a specific component of its CWA obligations—a question that was not before the *BayKeeper* court and one not resolved by looking to a

---

[5] The *BayKeeper* court expressed no opinion on California's failure to submit TMDLs prior to 1994 and eschewed any "broad, generic determination of the point in time at which a state's inaction may be deemed a constructive submission." *Id.*

state's general compliance.  Accordingly, the Court finds it insignificant that the Ninth Circuit did not address an issue not raised by the facts of the case.  Moreover, far from foreclosing the application of the constructive submission doctrine to a particular pollutant or waterbody segment, the *BayKeeper* court cited with approval to *Scott*, which applied the constructive submission doctrine to TMDLs for a particular waterbody segment, Lake Michigan.  *See BayKeeper*, 297 F.3d at 882 (characterizing ruling as "consistent" with *Scott*).

Defendants also argue that applying the "constructive submission" doctrine to a particular TMDL interferes with the state's discretion to prioritize its TMDLs.  Unquestionably, state discretion is an important component of the CWA.  Resource constraints compel difficult choices as to which TMDLs should be performed before others—a choice that states are often better situated to make.  Perhaps in recognition of these constraints, the CWA provides no specific mechanism for reviewing this prioritization.  *See* § 303(d)(1)(A).  However, the state discretion argument is a red herring in this context for several reasons.

Applying the constructive submission doctrine to individual TMDLs does not invade state prioritization.  A constructive submission occurs only when a state has clearly and unambiguously *abandoned* its obligation to produce a TMDL or TMDLs. *See, e.g., San Francisco BayKeeper*, 297 F.3d at 883; *see also Alaska Ctr. for the Env't*, 762 F. Supp. at 1427(constructive submission when Alaska clearly and unambiguously abandoned its TMDL obligation).  It does not occur merely because a state has prioritized one TMDL over another.  *See Hayes*, 264 F.3d at 1024.

Relatedly, applying the constructive submission in this instance does not encroach upon Washington's ability to prioritize its TMDLs.  Ecology has not identified a specific TMDL which it is prioritizing over the TMDL at issue.[6]  In fact, Ecology has treated the Spokane River as a priority and kept it as such for a prolonged period of time, producing at least 78 TMDLs for this very water segment.  Ecology has already engaged in a significant amount of work with regard to this specific TMDL by compiling scientific data, preparing at least a preliminary TMDL draft, discussing its contents with the EPA, submitting it to other parties for some form of comment, and creating the Task Force for PCBs.

More importantly, while a state's failure to produce any TMDLs is perhaps the clearest indication that it has abandoned its statutory obligations, the Court finds nothing in the text of the CWA or its purpose to support Defendants' contention that a state's abandonment of a specific statutory obligation should be treated differently from a state's wholesale failure.  To the contrary, a state's discretion to prioritize TMDLs over other TMDLs does not remove its ultimate obligation to produce a TMDL for each water pollutant of concern in every 303(d) water segment.  *See* 33 U.S.C. § 1313(d) (2).  In light of this statutory obligation, it would be absurd for the Court to hold that a state could perpetually avoid this requirement under the guise of prioritization; such an administrative purgatory clearly contravenes the goal and purpose of the CWA.  33 U.S.C.A. § 1251 (a)(1) ("it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985").  Accordingly, the Court rejects Defendants

---

[6] Defendants assert that Ecology is currently producing other TMDLs; however, Defendants do not demonstrate that pursuing these other TMDLs precludes Ecology from pursing the PCB TMDL as well.  *See* Doc. No. 91 at 12.

contention that the constructive submission doctrine cannot apply when a state abandons its obligations under the CWA by clearly and unambiguously indicating that it will not produce a particular TMDL.

2.   No Constructive Submission Has Yet Occurred

In examining whether Ecology "clearly and unambiguously" decided not to submit a TMDL for PCBs in the Spokane River, the Court is confronted with an issue that has not been directly addressed by any other court: at what point does a state's failure to prepare a particular TMDL ripen into a constructive submission?

According to the EPA, Ecology's failure to submit the PCB TMDL is not a constructive submission because Washington has a robust TMDL program, which has produced 1,372 TMDLs statewide since 1999.  While a healthy TMDL program is required to show that a state is prioritizing other TMDLs over the TMDL in question, it is not, on its own, sufficient. *See supra* II A 1.  Naturally, a state that has publicly indicated, as Plaintiffs claim Ecology has, that it will not produce a specific TMDL has violated its statutory obligations with respect to that TMDL, no matter how robust its program otherwise is.  *See* 40 CFR § 130.2 (f) (states shall produce a TMDL for each water segment on the 303(d) list regarding each pollutant of concern).  Accordingly, the Court finds consideration of Washington's general TMDL program relevant but not dispositive in a case concerning failure to submit a particular TMDL.

Plaintiffs present Ecology's actions as an exceptional case, in which an agency essentially completed a TMDL and then abandoned the TMDL for an alternate course, actions which, according to Plaintiffs, unambiguously indicate Ecology will never comply with its statutory obligations, thus requiring the EPA to prepare the TMDL.  Doc.

No. 101 at 9.  The EPA and Ecology counter that information gaps, scarce resources, and lengthy administrative processes led Ecology to adopt an alternative approach, for the time being, without ruling out a TMDL in the future.  Doc. No. 91 at 15-17.  If, as Plaintiffs contend, the PCB TMDL was essentially complete and ready for submission, a last-minute pivot to an illusory alternative may indicate a decision to abandon the TMDL. By contrast, if information gaps persisted such that Ecology determined that it could not confidently issue a TMDL at any point in the near future, adopting an alternative may, under some circumstances, represent a reasonable interim measure rather than an abandonment of any future plans to prepare a TMDL.

The Court need not define the precise contours of this doctrine at this time.  The facts in the record readily demonstrate that Ecology had sufficient reasons for not completing the TMLD: The Court finds that Ecology lacked sufficient scientific data and had not satisfied certain pre-submission requirements, i.e. public notice and consultation.

i.   Scientific Data

Defendants assert that, far from being essentially complete, substantial work remained to be done before Ecology could submit the TMDL.  First, Defendants argue that Ecology lacked sufficient scientific data to produce a complete TMDL.  According to the EPA, Ecology did and still does not know the source of 57% of PCB loading in certain parts of the Spokane River.  V. 1, T. 15 at 163.  Similar information gaps existed in other segments.  V.3, T.69 at 1205; V. 5, D. 132 at 2683.  In light of this uncertainty, the EPA contends it would be unfair and unproductive to impose severe restrictions on only a fraction of identifiable polluters.  Plaintiffs counter that scientific uncertainty regarding pollution sources is not a sufficient justification for delay because it is inherent

in the TMDL process.  Plaintiffs' argument relies on language in the CWA stating that

TMDLs should include "margins of safety."  The Court rejects this argument.  The

"margins of safety" in the CWA are designed to take "into account any lack of

knowledge concerning the *relationship between effluent limitations and water quality*."

33 U.S.C. §1313(d)(1)(C)(emphasis added).  In other words, "margins of safety" address

uncertainty over the effect pollutants at certain levels will have on water quality; they do

not address a lack of knowledge regarding the *source* of the pollutants.  *See Natural*

*Resources Defense Council, Inc. v. Muszynski*, 268 F.3d 91, 101-02 (2d Cir. 2001).

While there may be a point at which a state possesses enough scientific data that failing

to submit the TMDL demonstrates intent to abandon that TMDL, the EPA did not err in

finding that the uncertainty here does not rise to that level.[7]

     ii. Procedural Gap

Defendants point out that Ecology also needed to perform certain procedural steps

before submitting the PCB TMDL.  An important preparatory step in the submission

process is the public notice and consultation period.  According to Plaintiffs, Ecology

satisfied these requirements when it sent the draft to the following stakeholders for

comment: Plaintiffs; Defendant-Intervenors; and certain EPA and Idaho state officials.

Plaintiffs assert that Ecology admitted that the draft "was issued for public comment in

June 2006" in its "Spokane River Toxics Reduction Strategy."  AR 485, 503.[8]

---

[7] Plaintiffs assert that the CWA specifically contemplates that the states will, at least occasionally, submit incomplete TMDLs because it gives the EPA the authority to disapprove of TMDLs.  The Court rejects this argument.  While the CWA contains a mechanism for rejecting an incomplete TMDL, the mere existence of this mechanism is not a sufficient reason to compel submission when a significant amount of data is missing.

[8] Plaintiffs also cite an email exchange between members of the EPA and Ecology in which EPA provided Ecology with various feedback over technical and practical issues associated with the PCB TMDL.  However, Plaintiffs do not demonstrate how these comments amount to a formal step in the process that would amount to proper notice.

Defendants counter that the draft TMDL was still in the preparatory stages and such informal comments and requests for feedback do not satisfy the formal notice requirements.  According to Defendants, the draft TMDL was specifically designated as incomplete and preliminary; it was marked "Draft – 6-19-06 – Do not cite or quote."  *See* AR 1331.  Defendants further assert that Ecology contemplated several additional steps before formal public disclosure, including additional studies of stormwater runoff and drainage.  *See* Spokane River PCB TMDL Stormwater Loading Analysis Final Technical Report, at v (Dec. 2007).  Plaintiffs have not shown these additional studies were unnecessary.  Accordingly, Ecology did not, as Plaintiffs contend, essentially complete the TMDL and withhold it without sufficient reason.[9]  Therefore, Ecology's failure to submit the PCB TMDL did not clearly and unambiguously indicate its intent to abandon the PCB TMDL.

**B.  Violation of Section 706(1) of the APA**

Plaintiffs' APA claim under Section 706(1) relies on the same operative facts asserted in the CWA claim.  Plaintiffs allege that the EPA's failure to disapprove Ecology's constructive submission constitutes "agency action unlawfully withheld or unreasonably delayed." a violation Section 706(1) of the APA.  This claim fails because it is premised on an assumption that Ecology's inaction amounted to a constructive submission.  As set forth above, no constructive submission has occurred.

---

[9] Scientific uncertainty and procedural gaps indicate that Ecology has not clearly and unambiguously abandoned its TMDL obligations in this specific context because Ecology has engaged in significant work toward completing the TMDL.  The Court need not decide whether these factors would be relevant in other scenarios, i.e. if Ecology had engaged in no (or very little) work on the PCB TMDL or if Ecology fails to make any scientific progress in the coming years.

**C.  Violation of Section 706(2)(A) of the APA**

       *a.  The EPA Abused its Discretion*

Under the APA, final agency actions must be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §706(2)(A).  The scope of the court's review under the APA is narrow, and a court may not substitute its own judgment for that of the agency.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  The agency's factual determinations are entitled to substantial deference and should be upheld if they are supported by the administrative record.  *Arkansas v. Oklahoma*, 503 U.S. 91, 112 (1992).  When reviewing an examining agency's scientific findings made within the area of an agency's technical expertise, the court must be at its most deferential.  *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376-77 (1989).  The party asserting the APA challenge bears the burden of demonstrating that the agency's actions were arbitrary or capricious.  *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).

Plaintiffs allege that the EPA's finding no constructive submission is arbitrary and capricious.  As discussed *supra*, the Court found that the EPA did not err in finding no constructive submission has yet occurred on the grounds that significant scientific information and procedural gaps remained.

Plaintiffs further allege that the EPA acted contrary to law and abused its discretion in approving the Task Force as an alternative to the TMDL.  Doc. No. 84 at 16.  The Court agrees with Plaintiffs; the EPA does not have the statutory authority to

18

approve a Task Force in lieu of a TMDL.  States may pursue reasonable courses to reducing pollution in addition to establishing TMDLs.  *See, e.g., City of Arcadia v. U.S. EPA*, 411 F.3d 1103, 1106 (9th Cir. 2005) ("states remain at the front line of combatting pollution").  However, nothing in the CWA provides that states may pursue these courses in place of, or as a means of indefinitely delaying, a TMLD.  To the contrary, the CWA expressly requires states to produce a TMDL for each pollutant of concern in each 303(d) water segment.  *See* U.S.C. § 1313(d)(1)(A); 40 CFR § 130.2 (f); *see also Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422, 1425 (W.D. Wash. 1991) (states must submit TMDLs).  Similarly, the CWA does not give the EPA authority to approve an indefinite delay; the CWA commands the EPA to ensure prompt compliance with the CWA.  *See Scott v. City of Hammond*, 741 F.2d 992, 998 (Congress intended TMDLs be established "promptly"); *Idaho Sportsmen's Coalition*, 951 F. Supp. at 967 ("Congress prescribed early deadlines for the TMDL process;" those deadlines could be interpreted to mean "months and a few years, not decades.").  Therefore, the EPA may not approve a task force as an alternative to a TMDL, i.e. a task force not designed to complete or assist in completing a TMDL.  *See Alaska Ctr. for the Env't*, 796 F. Supp. at 1379 ("The responsibility of the court is to ensure prompt and attentive adherence to the mandate of the CWA.").  The Task Force as presently proposed provides no way of determining if the Task Force has been effective in furthering the preparation of a TMDL.

In its letters, Ecology indicated that it is pursuing a Task Force in place of a TMLD because the TMDL would establish "an impossible near-term target."  *See* AR 14A at 503.  Ecology further stated that it views a TMDL as a "potential" "alternative" to be re-visited only if the Task Force fails to make "measurable progress."  *See* AR 14A at

503 (Ecology is not "currently planning to develop a PCB TMDL").  Ecology did not, however, define what constitutes measurable progress, nor did it clearly illustrate how the Task Force would produce or assist in preparing a TMDL.  Even more troubling, Ecology provides no firm deadline for when the Task Force will end and Ecology will submit a TMDL.  Rather, Ecology states only that it would "monitor and assess the effectiveness of toxic reduction measures" in 2017.  V. 1, T. 4, at 14; V. 1, T.A. at 3.  Thus, there is no metric to measure success, no clear trigger after which Ecology would produce a TMDL, and no specific date on which such a TMDL would be submitted to the EPA.  Compounding this uncertainty is the worrying lack of progress made with respect to the scientific data in recent years.  The EPA found that scientific uncertainty prevents the submission of a TMDL, yet it is unclear how or whether the Task Force will resolve that problem.[10]  The record indicates that the Spokane River has been on the 303(d) list since 1996 and after nearly 20 years still contains the worst PCB pollution in the state.  Despite this known problem and Ecology's prioritization of the Spokane River PCBs, a substantial percentage of the pollution sources remain unknown.  The failure to submit a TMDL also affects the ability of the Washington State Pollution Control Hearing Board to effectively limit pollutants and monitor water quality.  Had a TMDL been established, any issuance of permits would have been tied to the wasteload allocations specified in the TMDL.  40 C.F.R. §122.44(d)(1)(vii)(B).  Meanwhile, it is significant that no effective limitations have been put in place by the Board and the only significant condition imposed by the Board has been that point polluters participate in the Task Force.

---

[10] During oral argument, counsel for the EPA was unable to articulate precisely how the Task Force would resolve the scientific uncertainty.

There comes a point at which continual delay of a prioritized TMDL and detours to illusory alternatives ripen into a constructive submission that no action will be taken. With the Task Force as presently proposed, Ecology is coming dangerously close to such a point, and with EPA's support.   Accordingly, the Court finds that the EPA acted contrary to law in finding the Task Force, as it is currently comprised and described, a suitable "alternative" to the TMDL.   For the reasons set forth below, the Court remands the matter to the EPA for further consideration and consultation with Ecology.  *See e.g., Idaho Sportsmen's Coal.*, 951 F. Supp. at 969 (finding EPA abused its discretion in approving insufficient TMDL schedule, even though no constructive submission occurred).

### b.  The Issue Is Remanded to the EPA

When an agency "does not reasonably accommodate the policies of a statute or it reaches a decision that is 'not one that Congress would have sanctioned,' . . . a reviewing court must intervene to enforce the policy decisions made by Congress." *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1326 (D.C. Cir. 1988) (citations omitted).  An EPA regulation requires that "[s]chedules for submission of TMDLs shall be determined by the Regional Administrator and the State." 40 C.F.R. §130.7(d)(1).   This regulation derives from Congress's direction that states submit TMDLs "from time to time" under 33 U.S.C. §1313 (d).   Thus, the EPA has authority to set, with a state, a schedule to complete the TMDL process.  *See Idaho Sportsmen's Coal. v. Browner*, 951 F. Supp. 962, 968 (W.D. Wash. 1996); *see also Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1527-28 (9th Cir. 1995).  A firm schedule and concrete goals are important in this

21

case, especially since the state is pursuing an alternative route that may delay an already

delayed TMDL.  *See* AR 90 at 1334; AR 132 at 2675-76.

Accordingly, the Court sets aside the EPA's decision and remands this issue to the

EPA for additional consideration consistent with this order. Specifically, the EPA shall

work with Ecology to create a definite schedule with concrete goals, including: clear

statements on how the Task Force will assist in creating a PCB TMDL in the Spokane

River by reducing scientific uncertainty; quantifiable metrics to measure progress toward

that goal; regular checkpoints at which Ecology and the EPA will evaluate progress; a

reasonable end date, at which time Ecology will finalize and submit the TMDL for the

EPA's approval or disapproval; and firm commitments to reducing PCB production from

known sources in the interim.

### D.  Spokane Tribe's Claims

The Spokane Tribe asserts that the EPA, in addition to its obligations under the CWA and

APA, owed a trust responsibility to the Spokane Tribe.  The EPA counters that it owes only a

general trust obligation in this instance, which, according to the EPA, it discharged by complying

with generally applicable law.  There is a "distinctive obligation of trust upon the Government in

its dealings with [Indian tribes]." *Gros Ventre Tribe v. United States*, 469 F.3d 801, 812 (9th Cir.

2006).  This obligation alone, however, "does not impose a duty on the government to take

action beyond complying with generally applicable statutes and regulations."  *Id*. at 810;

*Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) ("[w]ithout an

unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts

must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one").  Unless

a specific duty exists, an agency's compliance with general regulations and statutes discharges

22

the agency's general trust responsibility to Indian tribes.  *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 574 (9th Cir. 1998).  In order to create a specific duty, the statutory language must "go[] beyond a bare trust and permit[] a fair inference that the Government is subject to duties as a trustee and liable in damages for breach."  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474 (2003).  This analysis involves an examination of whether specific rights are created by the statute—either creating a duty or imposing statutory or regulatory "prescriptions."  *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003).

In Count I, the Spokane Tribe asserts that the EPA breached its trust responsibility by failing to disapprove a "constructive submission" and not producing a TMDL.  Doc. No. 64.  The EPA counters that it discharged its trust responsibility by complying with generally applicable law, namely the CWA.  The Court agrees with the EPA; the Spokane Tribe has not identified a specific duty in this context.  The Spokane Tribe contends its status as a state for the purposes of the CWA and the EPA's approval of the Spokane Tribe's water quality standards imposed a heightened trust obligation on the EPA.  AR Supp. 10 at paras 8-9.  However, the Spokane Tribe cites to nothing that grants any specific rights to the Indian tribes.  In the absence of a specific right or obligation, the EPA's responsibilities amount to no more than a bare trust obligation, which can be discharged by complying with generally applicable law.  *See Gros Ventre Tribe*, 469 F.3d at 812 (observing that no breach exists where statutes and treaties only recognize a general or limited trust obligation to protect tribes on Reservation lands).  The Court has already found that the EPA has not violated the CWA by failing to find a constructive submission.  Accordingly, the EPA has not breached a trust obligation with respect to the CWA.

The Spokane Tribe further argues that the EPA owed the Spokane Tribe a trust duty regarding its April 12, 2013 approval of the Task Force as an alternative to the TMDL.  Doc. No.

23

64.  In addition to the APA obligations discussed *supra,* the Spokane Tribe asserts that the EPA had to consider the Spokane Tribe's fishing rights.  Doc. No. 64.  The EPA counters that "the [Spokane] Tribe's theory on how its fishing rights are impacted [by this decision] inappropriately assumes the Task Force will fail to reduce PBCs."  Doc. No. 102 at 12.  Since the Court has already found that the EPA violated generally applicable law with respect to its April 12, 2013 determination and will remand the matter to the EPA, the Court need not consider whether the EPA has any specific trust obligations at this time.

III.     CONCLUSION

While the Court does not find that on the record before it there has been a constructive submission, the Court does find that EPA's approval of the Task Force without adequate assurances that it will result in a TMDL within a reasonable time is in violation of EPA's statutory duties and, therefore, contrary to law and arbitrary and capricious.

NOW THEREFORE, IT IS ORDERED AS FOLLOWS:

1.  Plaintiffs and the Spokane Tribe's Motions for Summary Judgment are GRANTED with respect to their claims pursuant to § 706(2)(A) of the APA. EPA's approval of the Task Force as an alternative to the TMDL development, to extend over an indefinite period of time without adequate assurances that a TMDL will result, is held to be arbitrary and capricious, an abuse of discretion, and contrary to law;

2.  This matter is remanded to the EPA with directions to consult with Ecology and file herein, within 120 days of the date of this order, a complete and duly adopted reasonable schedule for the measuring and completion of the work of the Task Force, including quantifiable benchmarks, plans for acquiring missing scientific

24

information, deadlines for completed scientific studies, concrete permitting recommendations for the interim, specific standards upon which to judge the Task Force's effectiveness, and a definite endpoint at which time Ecology must pursue and finalize its TMDL;

3. EPA's Motion for Summary Judgment is GRANTED, with respect to Plaintiffs' CWA claims and the Spokane Tribe's claims under the CWA and related claims under the federal trust doctrine;

4. Plaintiffs and Spokane Tribe's claims under the CWA and the Spokane Tribe's claim for EPA's breach of its federal trust responsibility are DISMISSED WITHOUT PREJUDICE;

5. The Court retains jurisdiction pending compliance with this order.


_Barbara J. Rothstein_

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

25