1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

Richard A. Smith
SMITH & LOWNEY, PLLC
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SIERRA CLUB; and CENTER FOR              )     Case No. 11-CV-1759-BJR
ENVIRONMENTAL LAW AND                    )
POLICY,                                  )
                                         )     SECOND SUPPLEMENTAL
             Plaintiffs,                 )     COMPLAINT
                                         )
        and                              )
                                         )
THE SPOKANE TRIBE OF INDIANS,            )
                                         )
             Plaintiff-Intervenor        )
        v.                               )
                                         )
DENNIS McLERRAN;GINA                     )
MCCARTHY; and UNITED STATES              )
ENVIRONMENTAL PROTECTION                 )
AGENCY                                   )
                                         )
             Defendants,                 )
                                         )
        and                              )
                                         )
SPOKANE COUNTY; KAISER                   )
ALUMINUM OF WASHINGTON LLC;              )
and STATE OF WASHINGTON                  )
DEPARTMENT OF ECOLOGY,                   )
                                         )
             Defendant-Intervenors       )
_____  )

SECOND SUPPLEMENTAL COMPLAINT - 1
Case No. 11-CV-1759-BJR

## I.      INTRODUCTION

1.      The claim asserted in this second supplemental complaint by plaintiffs Sierra Club and Center for Environmental Law & Policy is that defendant EPA's administrative action in adopting "EPA's Plan for Addressing PCBs in the Spokane River," July 14, 2015, submitted in response to the March 16, 2015, order entered in this matter, is arbitrary and capricious, an abuse of discretion, and not in accordance with law. This claim is asserted under the Administrative Procedures Act, 5 U.S.C. § 701 – 706, and Plaintiffs seek declaratory relief, injunctive relief, and recovery of litigation expenses under Equal Access to Justice Act, 28 U.S.C. § 2412.

## II.      JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction and the relief requested herein is authorized by 5 U.S.C. §§ 701 – 706, 28 U.S.C. § 1331, and 28 U.S.C. §§ 1346(a)(2) and 2412.

3.      The office of defendants United States Environmental Protection Agency Region 10 and Dennis McLerran, its Administrator, is located in King County, Washington, within the Western District of Washington, and venue is therefore appropriate in the Western District of Washington pursuant to 28 U.S.C. § 1391.

## III.      PARTIES

4.      Plaintiff Sierra Club is suing on behalf of itself and its member(s).  Sierra Club is a national nonprofit organization of approximately 1.3 million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass water quality in the

SECOND SUPPLEMENTAL COMPLAINT - 2
Case No. 11-CV-1759-BJR

Spokane River. The Club's particular interest in this case and the issues that this case concerns stem from the Washington Department of Ecology's failure to prepare a water quality clean-up plan to address toxic chemicals, PCBs, in the Spokane River and its tributaries, and the challenged EPA action supporting that failure, thereby jeopardizing public health and the ability of Sierra Club members to use and enjoy these waters. The Washington State Chapter of Sierra Club has approximately 23,000 members.

5.       Plaintiff Center for Environmental Law and Policy is suing on behalf of itself and its member(s).  Center for Environmental Law and Policy is a non-profit corporation organized under the laws of the State of Washington.  It was founded in 1993 to serve as a voice for public interest water resource management and preservation in Washington State.  It has been actively engaged in advocacy and education to protect and restore water quality in the Columbia River Basin, including the Spokane River system.  It is a membership organization with members across Washington, including members who use and enjoy the Spokane River.

6.       Plaintiffs have representational standing to bring this action.  The recreational, economic, aesthetic and/or health interests of Plaintiffs and their member(s) have been, are being, and will be adversely affected by the challenged action.  The relief sought in this lawsuit can redress the injuries to these interests.

7.       Defendant Dennis McLerran is the Administrator of Region 10 of the United States Environmental Protection Agency and is sued in his official capacity.  Defendant McLerran is responsible for the action of the United States Environmental Protection Agency challenged in this lawsuit.

8.       Defendant Gina McCarthy is the Administrator of the United States Environmental Protection Agency and is sued in her official capacity.  Defendant McCarthy is

SECOND SUPPLEMENTAL COMPLAINT - 3
Case No. 11-CV-1759-BJR

responsible for the action of the United States Environmental Protection Agency challenged in this lawsuit.

9.      Defendant United States Environmental Protection Agency ("EPA") is an agency of the United States government charged with implementing the CWA.

## IV.      FACTS

10.     The CWA requires the establishment of the total maximum daily load ("TMDL") for each waterbody that a state determines fails to meet water quality standards despite the implementation of technology-based controls in National Pollutant Discharge Elimination System ("NPDES") permits. 33 U.S.C. § 1313(d)(1)(C).

11.     EPA regulation defines TMDL:

The sum of the individual [waste load allocations ("WLAs")] and [load allocations ("LAs")] for nonpoint sources and natural background. If a receiving water has only one point source discharger, the TMDL is the sum of that point source WLAs plus the LAs for any nonpoint sources of pollutant and natural background sources, tributaries, or adjacent segments. TMDLs can be expressed in terms of either mass per time, toxicity, or other appropriate measure. If Best Management Practices (BMPs) or other nonpoint source pollution controls make more stringent load allocations practicable then wasteload allocations can be made less stringent. Thus, the TMDL process provides for nonpoint source control tradeoffs.[1]

12.     A load allocation ("LA") is

The portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources. Load allocations are best estimates of the loading, which may range from reasonably accurate estimates to gross allotments, depending on the availability of data and appropriate techniques for predicting the loading. Whenever possible, natural and nonpoint source loads should be distinguished.[2]

13.     A waste load allocation ("WLA") is

---

[1] 40 C.F.R. § 130.3(i).
[2] 40 C.F.R. § 130.3(g).

SECOND SUPPLEMENTAL COMPLAINT - 4
Case No. 11-CV-1759-BJR

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

The portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs constitute a type of water quality-based effluent limitation.[3]

14.     "Loading capacity" is "[t]he greatest amount of loading that a water can receive without violating water quality standards."[4]

15.      When a TMDL is developed for waters impaired by both point and nonpoint sources, and the WLA is based on an assumption that nonpoint source load reductions will occur, EPA's 1991 *Guidance for Water Quality-based Decisions: The TMDL Process* ("*EPA TMDL Guidance*"[5]) states that the TMDL should provide *reasonable assurances* that nonpoint source control measures will achieve expected load reductions for the TMDL to be approvable.[6] This information is necessary for EPA to determine that the TMDL, including the load and wasteload allocations, has been established at a level necessary to implement water quality standards.

16.     Washington's WQ Standards [WAC Ch. 173-201A], along with the Washington Water Pollution Control Act [RCW Ch. 90.48], provide Ecology with the tools to fully implement TMDLs, including the requirement that the state provide reasonable assurance that nonpoint sources can be required to meet TMDL load allocations if the wasteload allocations established for point sources depend on those nonpoint reductions being made in the TMDL area.

17.     The "precise figures" related to WLAs and LAs in a TMDL will be upheld in court if they fall within a "zone of reasonableness," regardless of uncertainty.[7]

---

[3] 40 C.F.R. § 130.3(h).
[4] 40 C.F.R. § 130.3(f).
[5] AR 47.
[6] *Am. Farm Bureau Fed'n v. EPA*, 984 F.Supp.2d 289, 325 – 327 (M.D. Penn. 2013) (discussing reasonable assurances requirement for LAs); AR 47 at 973.
[7] *Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9,  at 28 – 29 (1st Cir. 2012).; *Dioxin/Organochlorine Ctr. v. Rasmussen*, 1993 U.S. Dist. LEXIS 15595, 16 (W.D. Wash. 1993), *aff'd,*

SECOND SUPPLEMENTAL COMPLAINT - 5
Case No. 11-CV-1759-BJR

18.     In December 2011, EPA issued its "*PCB TMDL Handbook*" to assist specifically in PCB TMDL development by identifying different approaches that have been successfully used, and "to address how to develop PCB TMDLs that account for all sources of PCB contamination (including 'passive' sources such as landfills in which PCBs are contaminating the soil)."  It describes three levels of modeling approaches to develop PCB TMDLs, and recognizes that estimation of loadings (consistent with the explicit language of 40 C.F.R. §130.2(g)) should be based on "the most recent and best available data." This comports with the absence in the CWA and EPA's regulations of permission to delay a TMDL "until better science can be developed, even where there is some uncertainty in the existing data."[8] An agency may not "avoid its statutory obligation by noting the [presence of] uncertainty."[9]

19.     The 2011 *PCB TMDL Handbook* endorses the "adaptive implementation" approach to TMDLs, which it defines as "an iterative implementation process that makes progress toward achieving water quality goals while using any new data and information to reduce uncertainty and adjust implementation activities."

20.     Adaptive implementation TMDLs are particularly appropriate where (as is the case for PCBs in the Spokane River) non-point rather than point source pollution dominates, for complex problems, and where narrative criteria (i.e., impairment of designated uses, such as evidenced in the Spokane River by the Washington Department of Health determination that ingestion of fish from the river presents a *human health hazard* and its imposition of fish

---

*Dioxin/Organochlorine Ctr. v. Clark*, 57 F.3d 1517 (9th Cir. 1995) (citing *Hercules, Inc. v. EPA*, 598 F.2d 91, 96 (D.C. Cir. 1978)).

[8] *Upper Blackstone,* 690 F.3d 9, 22. "The Act's goal of 'elimint[ing]' the discharge of pollutants by 1985 underscores the importance of making progress on the available data. *Upper Blackstone,* 690 F.3d at 22 (*quoting* 33 U.S.C. § 1251(a)(1)).

[9] *Id,* 690 F.3d at 23 (*quoting Massachusetts v. EPA*, 549 U.S. 497, 534 (2007)).

SECOND SUPPLEMENTAL COMPLAINT - 6
Case No. 11-CV-1759-BJR

consumption advisories[10]) are involved. Consistent with TMDL regulations, the *PCB TMDL Handbook* expressly endorses estimation of source contributions in TMDL development.[11]

21.     "The Spokane River has the worst PCB contamination in the state and has been subject to a Spokane County and Washington Department of Health fish consumption advisory since 1994 and 2003, respectively."[12] The most current 303(d) lists, for 2008 and 2010, identify fifteen segments of the Spokane River that exceed fish tissue standards derived from the National Toxics Rule's 0.00017 ug/L (170 pg/L) total PCB human health criteria, which applies in Washington waters.[13] Some of these segments have been 303(d)-listed since 1996.[14] Monitoring indicates that the PCB contamination problem is worst in downstream sections of the river where it crosses the territory of the Spokane Tribe of Indians.[15]

22.     Under the CWA "treatment as a state" provisions, EPA approved the Spokane Tribe's human health water quality criteria in 2013.[16] "The Tribe's water quality criterion for total PCBs is 1.3 pg/L. This criterion is more than two orders of magnitude lower than the current Washington criterion and is probably the lowest PCB criterion in the county."[17] Such stringency is warranted as the Tribe considers the danger to human health presented by Spokane River fish consumption to impair its fishing rights.[18] "Because the primary way by which people are exposed to PCBs is through the consumption of contaminated fish and/or shellfish (in which

---

[10] AR 15 at 97; AR Supp. 5; AR Supp. 7 at 2950 – 2951.
[11] 40 C.F.R. §§ 130.2(g) and 130.7(c)(1)(i) (In developing a TMDL, "[s]ite specific information should be used *wherever possible*." (emphasis added)).
[12] Dkt. 120 at 4.
[13] *Id.*
[14] *Id.*
[15] AR 15 at 73 and 163.
[16] Dkt. 129-1 at 4.
[17] *Id.*
[18] AR 81 at 1285; AR 85 at 1298 – 1299.

SECOND SUPPLEMENTAL COMPLAINT - 7
Case No. 11-CV-1759-BJR

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

PCBs may have bioaccumulated in tissue), assumptions about average fish consumption rates affect the derivation of concentrations in water quality standards."[19]

23.     PCBs have a limited solubility in water. Because PCBs are hydrophobic compounds, they tend to bind to sediments and organic particulate matter, which in turn may enter the food chain rather than remain in the water column. Although background levels for water column measurements can be in the parts per quadrillion range, the sediments in which PCBs tend to accumulate can often have levels two to three orders of magnitude higher.[20]

24.     Significant sources of PCBs in the Spokane River include effluents from municipal, industrial, and stormwater point source dischargers, and contamination originating in Idaho and the tributary Little Spokane River.[21]  Estimated PCB loadings from five of the six most significant NPDES-permitted point sources on the river downstream of the Idaho state line are as follows:  Liberty Lake Sewer & Water District ("Liberty Lake STP") (2.9 milligrams per day (mg/d)), City of Spokane's Riverside Park Water Reclamation Facility ("Spokane Riverside STP") (194 mg/d), Kaiser Aluminum Fabricated Products, LLC (65 mg/d), Inland Empire Paper (45 mg/d), and City of Spokane stormwater (691 mg/d).[22]

25.     NPDES permits for these discharges, issued by Ecology, include requirements to participate in the Spokane Regional Toxics Task Force ("SRTTF" or "Task Force") in lieu of numeric water quality-based effluent limitations ("WQBELs").[23] Ecology justified the omission of PCB WQBELs by noting that its 2006 draft Spokane River PCB TMDL had not been

---

[19] Dkt. 129-1 at 3 – 4.
[20] Dkt. 129-1 at 2 – 3 (footnote omitted).
[21] AR 15 at 155.
[22] AR 15 at 156 - 157; AR 104 at 2348; AR 96 at 1752; AR 92 at 1509.
[23] AR 91 at 1482 – 1485; AR 95 at 1695; AR 98 at 1903 – 1905; AR 103 at 2319.

SECOND SUPPLEMENTAL COMPLAINT - 8
Case No. 11-CV-1759-BJR

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

finalized, so there are no WLAs to convert to effluent limitations.[24] In Plaintiffs' separate

challenge of the NPDES permit for the SCRWRF, the Washington Pollution Control Hearings

Board found that provisions substantially identical to those found in each of these permits are

inadequate to ensure against violations of PCB-related water quality standards as the CWA

requires.[25]

26.     Loadings from Idaho and the Little Spokane River are estimated at 477 and 97

mg/d, respectively.[26] Point source contributors of pollutants to the river upstream in Idaho are

directly regulated by EPA, and include the City of Coeur d'Alene, Hayden Area Regional Sewer

Board, and the City of Post Falls.[27]

27.     EPA and Ecology have agreed that "[w]here Washington is engaged in a TMDL

that has cross border issues EPA will provide the leadership for bringing those issues to

resolution."[28]

28.     By order dated March 16, 2015, the Court granted in part Plaintiffs' summary

judgment motion, finding arbitrary, capricious, and contrary to law EPA's agency action

condoning Ecology's approach to Spokane River PCB cleanup and finding no TMDL

constructive submission.[29] The order remanded the matter to EPA

> with directions to consult with Ecology and file herein, within 120 days of the
> date of this order, a complete and duly adopted reasonable schedule for the
> measuring and completion of the work of the Task Force, including quantifiable
> benchmarks, plans for acquiring missing scientific information, deadlines for
> completed scientific studies, concrete permitting recommendations for the

---

[24] AR 92 at 1521; AR 93 at 1645 and 1650; AR 97 at 1842 and 1847; AR 104 at 2402.
[25] *Sierra Club, et al. v. Ecology, et al.*, PCHB No. 11-184 (Findings of Fact, Conclusions of Law, and Order, July 19, 2013), *aff'd*, Thurston County Superior Court No. 13-2-01995-4, Jan. 9, 2015, *review pending* Washington State Court of Appeals No. 47158-2-II.
[26] AR 15 at 160 - 163.
[27] AR 50; AR 51; AR 57; AR 58; AR 101 at 2071.
[28] AR 46 at 924; *see also* AR 58 (discussing need to coordinate PCB-related NPDES conditions between EPA-regulated Idaho permittees and Ecology-regulated Washington permitees).
[29] Dkt. 120.

SECOND SUPPLEMENTAL COMPLAINT - 9
Case No. 11-CV-1759-BJR

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

interim, specific standards upon which to judge the Task Force's effectiveness, and a definite endpoint at which time Ecology must pursue and finalize its TMDL[30]

29.     On July 14, 2015, EPA submitted EPA's Plan in response to this order.[31] EPA's Plan, challenged by this action, comprises background information on Spokane River PCBs and the SRTTF, a schedule intended to satisfy the remand order, and interim NPDES permitting recommendations.[32]

30.     Identified prominently among the SRTTF's activities by EPA's Plan is a monitoring and evaluation project to complete an ongoing PCB "source characterization and quantification" effort, expected to be completed a year after its December 2016 target.[33] This effort "should enable closure of one of the data gaps previously identified as the highest priority – source identification."[34] In addition, the SRTTF and its members have taken various "actions to identify and reduce diffuse sources of PCBs that impact stormwater."[35] The Task Force's assessment of potential best management practices ("BMPs") for PCB control will assertedly be completed by December 2016.[36]

31.     The initial section of EPA's Plan also discusses the requirement imposed by the Spokane River Dissolved Oxygen TMDL ("D.O. TMDL") on Spokane River point source dischargers to attain phosphorous reductions by installing "advanced solids-removal treatment technology that will remove substantial quantities of PCBs" as PCBs "are generally found adhering to solids."[37] Allowing time for this treatment technology, along with the assertedly

---

[30] *Id* at 24 – 25.
[31] Dkt. 129-1.
[32] Dkt. 129-1.
[33] *Id* at 9 - 10.
[34] *Id.* at 10.
[35] *Id* at 9.
[36] *Id* at 10.
[37] *Id* at 5 – 6.

SECOND SUPPLEMENTAL COMPLAINT - 10
Case No. 11-CV-1759-BJR

needed "time for Ecology and the Task Force to conduct and analyze the monitoring data that is expected to describe the new share of the load attributable to point sources," is EPA's primary justification to defer "immediate initiation of a TMDL."[38] But this specific monitoring and analysis is nowhere else discussed by EPA's Plan, much less scheduled.

32.     The other justifications posited by EPA are the likelihood of changes to Washington's applicable water quality standards, and a concern that prompt TMDL development would "eliminate the incentive for Task Force members to continue to work together to address sources for which they are not responsible."[39]

33.     EPA's Plan prefaces its actual schedule portion by asserting that it lacks the authority to establish a legally enforceable schedule for the Task Force or Washington State's submission of the PCB TMDL.[40] "EPA has not relied on [the regulation referenced by the Court's order] as the basis for this schedule, but rather has developed this schedule for the [defendant-intervenor] State's initiation and completion of a PCB TMDL in response to the Court's remand instructions."[41]

34.     The schedule in EPA's Plan includes four milestones towards the possible submission of a PCB TMDL, each identifying a date by which, if certain thresholds are not met, a 2.5 year (approximate) TMDL development process by Ecology must begin, ending with submission to EPA of the proposed TMDL.[42] By the first date, December 31, 2016, the SRTTF must complete a comprehensive plan summarizing available PCB data, listing and estimating identified sources of PCBS "with estimates of current loadings," identification of possible and

---

[38] *Id* at 12.
[39] *Id* at 13.
[40] *Id* at 11.
[41] *Id.*
[42] *Id* at 11 – 12.

SECOND SUPPLEMENTAL COMPLAINT - 11
Case No. 11-CV-1759-BJR

recommended BMPs to control PCBs, and "[r]ecommendations for future studies to address remaining data gaps."[43] By the second date, December 15, 2020, to again defer the PCB TMDL, EPA must determine by July 15, 2021, that the "annual central tendency of the preceding year" meets an instream concentration of 200 pg/L PCBs.[44] By the third date, December 15, 2024, EPA must determine by July 15, 2025, that instream concentration of PCBs meets 170 pg/L based on the annual central tendency of the preceding year.[45] By the fourth and final date, December 15, 2027, EPA must determine by July 15, 2028, the "applicable water quality standards for PCBs are met and the Spokane River and adjacent segments are no longer included on Washington's 303(d) list …" or the PCB TMDL must be submitted for EPA's approval by July 15, 2030.[46]

35.     EPA's plan, in its delay of the TMDL for nonsensical reasons, is inconsistent with the CWA and its implementing regulations and finds no support in reason or agency guidance.

36.     According to EPA (and Ecology) guidance, the water quality-based approach required by 33 U.S.C. §1313 and 40 C.F.R. § 130 involves the following sequence of steps: (1) identification of water quality-limited waters still requiring TMDLs (i.e., the 303(d) list), (2) priority ranking and targeting, (3) TMDL development, (4) implementation of control actions, and (5) assessment of water quality-based control actions.[47] EPA's Plan would take TMDL development, step 3, and put it last.

37.     According to the explanation in EPA's Plan, information about the efficacy of Spokane River dischargers' phosphorus-reduction treatment technology, required under NPDES

---

[43] *Id* at 11.
[44] *Id*.
[45] *Id* at 12.
[46] *Id*.
[47] *1991 TMDL Guidance* AR 47 at 967 – 968.

SECOND SUPPLEMENTAL COMPLAINT - 12
Case No. 11-CV-1759-BJR

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

conditions to meet the D.O. TMDL WLAs by 2024, will be "extremely relevant to the development of a TMDL."[48] Not only is the assertion about the relevancy of this information new – it was not a basis for defendant arguments in the previous phase of this litigation[49] - but it ignores the target-setting function of WLAs incorporated into NPDES permits as numeric WQBELs. EPA's Plan nowhere explains how or when this purportedly "extremely relevant" information would be collected or used.

38.     Nowhere in any agency's TMDL or water quality-based approach guidance is there any support for the approach offered by EPA's Plan. Nowhere in the guidance does EPA at all suggest that it is appropriate – or possibly consistent with the 33 U.S.C. § 1313 TMDL mandate – to wait for dischargers' technological improvements before establishing WLAs and TMDLs, much less technological improvements focused on an entirely different pollution problem. Instead, the guidance consistently posits that an adaptive implementation phased TMDL should come first and then be modified, in its implementation measures, WLAs, LAs, and other respects, as appropriate based on such subsequent information.

39.     The rationale of EPA's Plan that delay in adoption of a Spokane River PCB TMDL is warranted because "it is very likely that applicable water quality standards will change" is entirely spurious.[50] Water quality standards, by design, are regularly reviewed no less frequently than every three years, and required to be updated when necessary.[51] Waiting for the

---

[48] Dkt. 129-1 at 12.
[49] The precise information gaps cited by Defendants in briefing on the previous round of cross-summary judgment motions include only the amount of PCB loadings from storm water sources, identification of the sources of loadings to storm and sanitary sewer systems, information on Idaho and tributary sources, and identification of unknown sources. Dkt. 91 at 14 – 17; Dkt. 93 at 7 – 8; AR 32 at 2671 – 2672.
[50] Dkt. 129-1 at 13.
[51] 40 C.F.R. § 131.20.

SECOND SUPPLEMENTAL COMPLAINT - 13
Case No. 11-CV-1759-BJR

1    "end" of these changes before adoption of a TMDL or other aspects of the CWA's water quality-

2    based approach would frustrate the Act.

3        40.    Ecology has the legal authority adequate to provide "reasonable assurance" that

4    nonpoint source controls will be implemented toward attainment of LAs.

5        41.    Under EPA's Plan, these controls are instead voluntarily undertaken by

6    dischargers, along with various monitoring activities, in the context of the Task Force. The

7    development of a TMDL need not mean the end of the Task Force's efforts or of nonpoint source

8    controls. Indeed, the Task Force appears well positioned to serve as the collaborative stakeholder

9    process necessary for an adaptive implementation TMDL approach. Dischargers could still be

10   required to participate in the Task Force to comply with NPDES permit conditions as they are

11   now. To the extent that efficacy of voluntary Task Force efforts could be reduced if dischargers

12   lose incentive to voluntarily participate, Ecology should be able to compensate through the legal

13   tools available to it to provide "reasonable assurance" that the TMDL be implemented, and

14   through "nonpoint source control tradeoffs" facilitated by the TMDL and state regulation.[52]

15   Thus, a desire to continue the work of the Task Force and the nonpoint source control efforts

16   currently planned or underway is no reason to delay the TMDL.

17       42.    Under EPA's Plan, Ecology's submission of the PCB TMDL for the Spokane

18   River can be postponed beyond 2023 if specified benchmarks are met.[53] These benchmarks are

19   described as instream concentration of PCBs meeting 200 and then 170 pg/L "based on the

20   annual central tendency of the preceding year."[54]

---

[52] 40 C.F.R. §130.3(i) (defining TMDL); WAC 173-201A-450.
[53] Dkt. 129-1 at 11 – 12.
[54] Id.

SECOND SUPPLEMENTAL COMPLAINT - 14
Case No. 11-CV-1759-BJR

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

43.     There are two major problems with these benchmarks – they exclude consideration of the more important and relevant environmental metrics sediment and tissue PCB concentrations and they are vague.

44.     In addition to overlooking the significance of the more direct relationship between sediment and tissue contamination and non-attainment of PCB criteria, EPA's Plan's benchmarks are somewhat ambiguous and may already be actually attained, defeating their purpose as measures of progress.

45.     EPA's Plan clarifies that EPA does not believe that it has the legal authority to implement the plan by requiring TMDL submission.[55] Unless the Court retains jurisdiction to see the plan for the TMDL implemented, the whole matter, EPA seems to believe, is thrown back to the state's discretion regardless of any plan that EPA may adopt.

## V.     CAUSE OF ACTION

46.     The preceding paragraphs are incorporated herein.

47.     Under the APA, a reviewing court is to set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The court has broad authority to issue injunctive relief to allow enforcement of the CWA.

48.     EPA's Plan is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the CWA.

## VI.     RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

---

[55] Dkt. 129-1 at 11 (EPA regulations do "not authorize EPA to establish a legally enforceable schedule for State submissions of TMDLs or for work by an independent task force.").

SECOND SUPPLEMENTAL COMPLAINT - 15
Case No. 11-CV-1759-BJR

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

A.    Issue a declaratory judgment that EPA's Plan is arbitrary and capricious, an abuse of discretion, and inconsistent with the law;

B.    Vacate and remand EPA's Plan with specific instructions for its reformulation and reissuance;

C.    Retain jurisdiction to see EPA's Plan through to finalization of the Spokane River PCB TMDL;

D.    Award Plaintiff their litigation expenses, including reasonable attorneys' and expert witness fees under EAJA, 28 U.S.C. § 2412, and

E.    Award such other relief as this Court deems appropriate.


RESPECTFULLY SUBMITTED this 2nd day of June, 2016.

Smith & Lowney, pllc


By: s/Richard A. Smith
Richard A. Smith, WSBA #21788
Attorneys for Plaintiff
2317 E. John St.,
Seattle, WA 98112
Tel: (206) 860-2124
Fax: (206) 860-4187
E-mail: rasmithwa@igc.org

SECOND SUPPLEMENTAL COMPLAINT - 16
Case No. 11-CV-1759-BJR